ALFRED HUMPHREY

*v.*

THE VIRGINIAN RAILWAY COMPANY

(No. 9944)

Submitted September 15, 1948. Decided

December 18, 1948.

Fox and KENNA, JUDGES, dissenting.

*William L. Lee* and *John R. Pendleton*, for plaintiff in error.

*Carl B. Vickers* and *Howard W. Carson*, for defendant in error.

RILEY, PRESIDENT:

Plaintiff, Alfred Humphrey, instituted this action in the Circuit Court of Fayette County against The Virginian Railway Company, C. T. Wade, B. L. Murphee, Ray Thompson and Cecil Terry to recover damages for personal injuries, which included the loss of both legs above the knees, a fractured scapula and numerous bruises and lacerations. The jury rendered a verdict against the railway company in the sum of forty thousand dollars and acquitted the individual defendants. To the judgment against it, based upon the jury verdict, the railway company prosecutes this writ of error.

The declaration, consisting of two counts, charged, and the evidence established, that plaintiff was injured by a train of the defendant railway company on or adjacent to the west end of a public crossing at Willis Branch, Fayette County. The first count of the declaration, directed against the railway company, C. T. Wade, its engineer, and its fireman, B. L. Murphee, and other agents, servants and employees unnamed in the declaration, charges plaintiff's injuries to the negligent operation of the train by defendant's said engineer and fireman and "other agents, servants and employees" of defendant corporation; and the second count of the declaration charges that the railway company and the defendants, Thompson and Terry, its section foreman and road master in charge of the construction and maintenance of the crossing and defendant's railway tracks, respectively, and other agents, servants and employees, carelessly and negligently failed to perform the alleged duty of inspecting, keeping, repairing and maintaining the crossing in a safe and usable condition, as a result of which plaintiff caught his left foot between the plank of the crossing and the rail so that he was struck by defendant's train before he could extricate himself.

At the place of the injury, defendant's railway runs in a generally east-west direction and a public road

parallels the railroad on its north side about twenty-five feet therefrom, from which a secondary dirt road runs up a sharp incline and diagonally crosses the railroad at the crossing in question in a generally southeast direction toward Willis Branch, Fayette County. The crossing is constructed of hard-surfacing material and oak boards five inches thick, ten inches wide and twenty-four feet long, placed on both sides of each rail. These boards rest on one and two-inch shims placed on the ties and fastened by twelve-inch boat spikes driven through the boards and shims into the ties. The outside boards are placed against the rail, but, in order to accommodate the flanges of the train wheels, the inside boards are placed approximately two and one-half inches from the rails. Between the inside boards, the crossing, for a width of fourteen feet is covered with rock ballast with a layer of asphalt next to the rail, and the ends of the inside boards are beveled about seven inches. The beveling is required, according to defendants' evidence, to lessen the danger of the brake, rigging and other underlying parts of the locomotive and cars striking the boards. At the end of the inside board, between which and the rail, plaintiff claims his foot became caught, the board slants from two inches at the side nearest the rail to three and one-half inches at the far side. At the time and place plaintiff claims his foot was caught, this board extended somewhat beyond the hard surface of the crossing, though there is substantial evidence introduced by defendants, that at the time the crossing boards were originally placed the hard-surfacing extended to the end of the boards. The rails at the point in question are seven and one-half inches high, and, according to plaintiff's evidence, which in view of the jury verdict must be taken as true, the tops of the rails are one and one-half inches higher than the inside board. The top of the rail is one and one-half inches in depth and extends one and one-eighth inches from the web of the rail making a space on slanting angle from the near side of the board to the bottom of the rail of approximately five and one-fourth inches.

As the train, consisting of fifty-seven loaded coal cars, seven of one hundred tons each and fifty of fifty tons and a caboose, with an engine pulling in front and two in the rear engaged in pusher service, approached the crossing from the west going in the direction of Pax, it was on an upgrade of one-tenth of one per cent, with a curve of approximately four degrees leading into a tangent at three hundred twenty-eight feet from the west end of the crossing  As disclosed by an actual test made at night with a locomotive of the type involved in this action, the crossing could be seen for the first time at the front of the locomotive on the engineer's side at a distance of two hundred sixteen feet ten inches, and from the fireman's side at three hundred ten feet six inches. Defendant's evidence is to the effect that after emerging from the curve at night a short interval of time is required for the engineer and fireman to focus their eyes on the site of the crossing.

Shortly before plaintiff was struck, it had been raining and there was a rising mist. As the train approached the crossing, it was travelling at a speed of twenty to twenty-five miles an hour.  The engineer Wade testified that if the tracks and wheels were dry, the train would travel a thousand feet before it could be brought to a stop and twelve hundred to thirteen hundred feet would be required if the rails were wet.  But other witnesses testified variously to the distance in which the train could be brought to a stop.  One of plaintiff's witnesses testified that the train could be brought to a stop on dry tracks at three hundred feet, and several other witnesses, two of whom testified for the plaintiff, gave the distance required to stop at four to twelve hundred feet in dry weather, and farther if the rails and wheels were wet.

On Saturday evening, July 14, 1945, plaintiff, after attending a picture show at Pax, a town a short distance east of the crossing, went to Long Branch to a pool room, immediately west of the crossing, where beer was served.  He remained there until the proprietor closed

the place at midnight. While there he said he drank four or five bottles of beer, but one witness, W. E. Sweeny, testified that plaintiff and one Jack Penn, a colored man, were drinking what witness thought was moonshine whiskey, and that plaintiff was intoxicated. Plaintiff denies this, and asserts he was not intoxicated. Other witnesses testified variously as to whether plaintiff was, in fact, intoxicated. After the closing of the pool room, plaintiff and Jack Penn went to the latter's home, where they played cards until nearly two o'clock Sunday morning, when plaintiff started toward his home at Willis Branch. In proceeding there plaintiff did not follow the public road to the crossing, but went up a steep bank to a path running along the railroad on the north side and followed the path east until he reached the northwest corner of the crossing. He testified as he walked along the path, he stepped "up" on the hard surface of the crossing, where vehicular traffic crossed the railway tracks, stepped over the north rail and stumbled in the middle of the tracks, catching his left foot between the inside board and the south rail. In this connection it is well to note that the crossing proceeding as it did diagonally across the railroad in a southeasterly direction, the hard-surfacing thereof was closer to the end of the planking at the north rail along which the path ran than it was to the end of the inside board between which and the south rail plaintiff caught his foot. In fact, one of the photographs in evidence shows that the hard surface extended near or to the west end of the north inside board. After catching his foot, plaintiff testified that he injured his ankle, became excited and tried vainly for three or four minutes to free himself, when he saw the headlight of defendant corporation's approaching train, and remembered nothing thereafter until he regained consciousness in the hospital. In his excitement and terror he testified he did not think of removing his foot from the caught shoe. Though plaintiff testified he was standing as the train approached, the engineer Wade and the fireman Murphee say that though they were keeping a proper lookout they

did not see plaintiff in his perilous position. Their testimony is to the effect that they did not stop their train and did not learn of the incident until the train arrived at Elmore, thirty or forty miles away. These witnesses testified that the bell, electrically operated, was ringing continuously and that the whistle was blown at the mile post governing the crossing and farther west for the crossing at Long Branch. In all probability, on the basis of this testimony, the jury found the engineer and fireman not guilty of negligence as alleged in the first count of the declaration.

Shortly after plaintiff was struck and notwithstanding his grave injuries, he crawled up a "red-dog" road leading to a nearby house, a distance of approximately two hundred and ten feet, where he aroused the attention of the occupant, a witness named Blake, who, together with other neighbors, came to plaintiff's assistance, hurriedly called a physician who arrived shortly thereafter and summoned an ambulance, which arriving some time later, took plaintiff to a hospital where his legs were amputated between the hips and knees. While plaintiff was lying on the ground awaiting the arrival of the ambulance, according to some witnesses, he stated that his injury was caused by the fact that he was under the influence of intoxicating liquors.

Plaintiff's left shoe, with the foot in it, was found wedged between the inside crossing board and the south rail at or near the southwest corner of the boards. The shoe was pointing toward the east and to some extent was standing on the toe with the rubber heel off, which was found six or seven inches on the crossing between the inside board and the rail. Plaintiff's right shoe, with the severed right foot in it, was found between the rails, six or eight inches west of the end of the south crossing boards and his pocketbook was two or three feet west of the end of the boards outside the track at the end of the ties. Blood was found at the point where the foot was wedged between the board and the rail;

flesh and blood were on the crossing east of the point where plaintiff claims he was injured; and blood was found both inside and outside the south rail, a "puddle of blood", maybe "half a pint" was on the outside of the track about where plaintiff's pocketbook was found, west of the end of the outside crossing boards.

The defendant, Ray Thompson, who had been defendant railway company's section foreman for about thirteen years, testified that the crossing was last renewed prior to plaintiff's injury on July 15, 1945, in either 1937 or 1938; and that in 1941 or 1942 some repair was made, necessitating the taking up of the boards. This witness further testified that it was standard construction for the board to be placed "at or near the top of the rail"; that such elevation could be achieved by jacking up the rail and tamping; and that with the exception of the time of the repair in 1941 or 1942, the crossing had never been jacked up or raised in order to bring the boards closer to the top of the rails. This witness further testified, on cross-examination, that the beveling of the board from the end four inches on the side away from the rail and seven inches on the side nearest the rail was, so far as the witness knew, not standard construction, and road master Terry testified substantially to the same effect.

Five grounds of reversal are asserted by defendant railway company in its brief: (1) That the individual employees having been acquitted of negligence, there can be no recovery against their employer, the railway company; (2) the verdict being general and based upon both counts of the declaration, namely, the negligent operation of the train and the unsafe condition of the crossing, the trial court, in refusing to set aside the verdict, could not tell upon which theory the verdict was based; and, therefore, the verdict is inconsistent with the declaration; (3) the verdict is contrary to the weight of and not supported by the evidence; (4) plaintiff's instructions Nos. 1, 3 and 4 are abstract and preju-

dicially misleading to the jury; and (5) the crossing was, in fact, reasonably safe for travel thereover by the public and complied with all the requirements of Section 8, Chapter 40, Acts of the Legislature (1st Ex. Sess.), 1933, governing the maintenance and construction of railroad and railway roadbeds at public crossings.

The first ground for reversal is to the effect that the individual defendants having been acquitted of negligence, there can be no recovery against their employer, the railway company. In the appraisal of this ground, it is necessary that we consider the two counts of the declaration separately.

The gravamen of the first count of the declaration is that plaintiff was injured as the result of the joint negligence of the railway company, C. T. Wade, its engineer, and B. L. Murphee, its fireman, and "the other agents, servants and employees" of said defendant railway corporation in the operation of the railway company's locomotive. It is to be noted that this count of the declaration alleges acts of negligence which are grouped under a single charge that the locomotive was being operated negligently. It contains no allegation that defendant railway company had or took any active charge of the operation of the locomotive, or that the defendant employees were incompetent, so that the railway company's liability under the first count of the declaration is necessarily predicated solely upon the alleged negligent acts of the employees, Wade and Murphee, and the jury verdict having affirmatively exonerated these defendants, the railway company has violated no duty under the allegations of this count of the declaration. The railway's liability resting solely upon the servants' acts, the verdict finding for the latter and against the railway company is inconsistent and will not support the judgment against the railway company on the first count of the declaration. *New Orleans & Northeastern R. Co. v. Jopes*, 142 U. S. 18, 24 S. Ct. 109, 111, 35 L. ed. 919; *Ashworth v. Alabama G. S. P. R. Co.*, 211 Ala. 20,

99 So. 191; *Zimmerman v. Adams Express Co.,* 240 Pa. 316, 87 A. 283; *Cialmatalo v. Adams,* 275 Mass. 521, 176 N.E. 610; 75 A.L.R. 1189 and note; *Ivanhoe Furnace Corporation v. Crowder's Admr.,* 110 Va. 387, 66 S.E. 63; *Barnes v. Ashworth,* 154 Va. 218, 153 S.E. 711; *Dalby v. Shannon & Florence,* 139 Va. 488, 124 S.E. 186; *Monumental Motor Tours v. Eaton,* 184 Va. 311, 35 S.E. 2d 105; 35 Am. Jur., Master and Servant, Section 534, and cases cited under note 11; 57 C.J.S., Master and Servant, Section 619(b) and cases cited under note 21. As, under the first count of the declaration plaintiff seeks to recover against the railway company, as well as the employees, for injuries caused solely by the alleged negligence of the employees, no recovery can be had under this count, and, as the record stands, it is as though the count had not been proved.

But the question whether recovery may be had against the railway company under the second count of the declaration, though the jury found that defendants, Ray Thompson, section foreman, and Cecil Terry, road master, were not guilty, presents an entirely different situation. Section 8, Chapter 40, Acts of the Legislature, First Extraordinary Session, 1933, Code, 17-4-8, reads as follows: "Whenever any railroad or electric or other railway, heretofore or hereafter constructed, shall cross any State road, it shall be required to keep its own road-bed, and the bed of the road or highway at such crossing, in proper repair, or else to construct and maintain an overhead or undergrade crossing, subject to the approval of the state road commisssioner; and the tracks of such railroad or railway at grade crossings shall be so constructed as to give a safe and easy approach to and across the same, * * *." Though this provision of the statute is neither expressly pleaded nor referred to in the second count of the declaration, such is not necessary. In *Hysell v. Central City,* 64 W.Va. 133, pt. 2, syl., 61 S.E. 43, this Court held: "Where the duty to keep its streets in repair is imposed upon a municipality by its charter or by general statute, of which the court is bound to take

judicial notice, no averment in the declaration as to such obligation is necessary." So this statute is part and parcel of the second count of the declaration, as though it had been referred to by citation and quoted verbatim in that count.

The second count alleges that plaintiff's injuries were the result of the carelessness and negligence of the defendant railway company, Ray Thompson, its section foreman, Cecil Terry, its road master, "and the other agents, servants and employees of the defendant corporation" in failing to "inspect, keep, repair and maintain [the crossing in question] and otherwise use due and reasonable care to keep the same in safe and useable condition for people, and this plaintiff lawfully using the public crossing in question upon and over the defendant's railroad tracks." Reading Code, 17-4-8, into the second count, as should be done under the holding in *Hysell v. Central City, supra,* this count, unlike the first count, alleges two separate derelictions of duty, one, the failure of the railway company to perform its statutory duty to keep and maintain the crossing in safe condition, and, two, the alleged failure of Thompson and Terry, and "the other agents, servants and employees" to perform their alleged duties as such employees. The statute, providing for the duty on the part of the railway company to maintain the crossing in safe condition without containing any reference to due care or negligence is strikingly like Code, 17-9-33, as reenacted and re-designated, Chapter 40, Acts, 1933, First Extraordinary Session, which provides for an action of damages for injuries due to a street or county road being out of repair. In *Depue v. Baltimore & Ohio Railroad Co.,* 100 W.Va. 667, 131 S.E. 462, this Court held that a joint action may be maintained against a county court and a railroad company for their failure to keep in repair a county-district road at a railway crossing, as the county court was required to do under Section 23, Chapter 39, Barnes' 1923 Code, and the railway company was required to do under Section 65, Chapter 43 of Barnes' Code, which has substantially the same pur-

port as the present statute governing the duty of railroads and electric railways where a public road or street crosses the tracks. In that case this Court said on page 669 of the opinion: "So that the duty of repair and maintenance at crossings being by the statute cast on both the county and the railroad company, both are, and each is, liable to the injured person, the railroad primarily, and the county court secondarily, but both jointly, if the injured person elects to pursue both." The statute here involved being peremptory is, in our opinion, absolute and nondelegable, and though the railroad company like a municipality or county, is not an insurer, the statute casts upon the railway company the nonassignable duty in any event to keep and maintain the crossing in a reasonably safe condition.

The railway company's duty being nondelegable, this case, in our opinion, is controlled by *Wills v. Montfair Gas Coal Co.*, 104 W.Va. 12, 18, pt. 1, syl., 138 S.E. 749. The declaration in that case charged the defendant coal company and one Jarrett, its superintendent, with alleged negligence in employing as a snapper, against the express wishes of the father, plaintiff's decedent, a minor, in the company's coal mine, in violation of the then statute, Barnes' Code, 1923, Chapter 15H, Section 72, which provided that "no child under the age of sixteen years shall be employed, permitted, or suffered to work in any mine, quarry, tunnel or excavation." The jury rendered a verdict in favor of plaintiff and against the coal company, which verdict was silent as to the superintendent Jarrett, and judgment was entered on such verdict. On writ of error to this Court the coal company contended that the verdict being silent as to Jarrett, constituted an acquittal by jury verdict of that defendant, and that under the doctrine of *respondeat superior* the verdict should fail as to the coal company. This Court held, in effect, that the statutory duty imposed upon the coal company was absolute, and therefore the doctrine of *respondeat superior* should not apply to defeat recovery against the coal company.

To the effect that the statutory duty of an employer, under Barnes' Code, 1923, Chapter 15H, Section 72, under consideration in the *Wills* case, relating to the employment of a child under the age of sixteen "in any mine, quarry, tunnel or excavation" is an absolute duty in which the element of negligence does not necessarily enter, compare *Hammack v. Hope Natural Gas Co.*, 104 W.Va. 344, 140 S.E. 1, in which the consent of the father to the unlawful employment of a child under said Section 72 was held to be a bar to recovery, where liability is based solely upon the unlawful employment, and not upon negligence, with *Irvine v. Union Tanning Co.*, 97 W.Va. 388, 125 S.E. 110, in which it was held that the father's consent is immaterial, if the death is caused not by the unlawful employment, but by the employer's negligence as an independent factor. The latter case inferentially holds that where liability is based upon the employer's negligence, independent of the statute, the act of the father in consenting to the employment does not constitute contributory negligence, whereas in the *Hammack* case such consent was tantamount to the father's wrongful joining in an act of unlawful employment, an illegal act, from which he should not be permitted to benefit.

The *Wills* case, in our opinion, is strikingly like the instant case. The silence of the verdict as to Jarrett, the superintendent, was tantamount to a verdict of not guilty as to that defendant. See *Ivanhoe Furnace Corporation v. Crowder's Admr.*, supra; *Barnes v. Ashworth*, supra; and *Monumental Motor Tours v. Eaton*, supra. The allegations as to negligence in the *Wills* case are very similar to those contained in the second count of the instant declaration. The declaration in the *Wills* case, as disclosed by the printed record in that case, (Vol. 104-S, Supreme Court Records & Briefs) charges that the defendants "unlawfully and negligently employed, directed, permitted and required the said Tony Wills, then an infant under the age of sixteen years, as aforesaid, to leave his place and position of employment

as a 'trapper' where he was then and there employed, and by reason of such negligence his death ensued."

Also to the effect that where an employer, charged with a nondelegable and nonassignable duty, is joined with an employee or employees in an action to recover damages for negligence of the defendant in failing to perform the duty imposed upon the employer, and the declaration charges concurring negligence of the defendants and two distinct derelictions of duty, a verdict in favor of the employee or employees does not bar recovery against the employer, see *Devine v. Kroger Grocery & Baking Co.*, 349 Mo. 621, 162 S.W. 2d 813. In that case the action was brought by plaintiff against the employer, Kroger Grocery & Baking Company, Henry Boemler, the manager of the defendant store, and John Fromm, the owner of the building, to recover damages for injury alleged to have been sustained by plaintiff, a customer, by reason of the alleged dangerous and unsafe condition of the floor of the grocery store. The building owner Fromm was dismissed, a demurrer to plaintiff's petition having been sustained as to him, and upon a trial on the merits of the case, the jury found for the plaintiff and against the defendant grocery company and against the plaintiff in favor of the store manager. The Court held that two distinct torts were in issue, one on the part of the manager, and the other by the grocery company, and that the jury's verdict exonerating the manager and fixing the liability of the grocery company, was not inconsistent, so as to render a judgment based on that verdict reversible. The case was reversed on other grounds. In that case it was held that the duty of the grocery company to keep the premises in a reasonably safe condition cannot be delegated so as to avoid personal responsibility. Relying upon the principle that under the facts portrayed by the record in that case, the Court stated that "the principle of respondeat superior as used and applied here with reference to the liability of the master is a doctrine of the substantive law of torts and not of the substantive law of agency. 'Liability exists

only if all the requirements of an action of tort for negligence exist.' 1 Restatement Law of Agency, p. 464; 3 Select Essays in Anglo-American Legal History, pp. 377-390." The Court discussing the distinction between the duties of the defendant manager and defendant grocery company, and the absolute duty on the grocery company, said: "In short the appellant, Kroger Grocery & Baking Company, irrespective of whether its manager was found to be negligent owed a duty to the respondent to maintain the store in such a manner as not to injure her by reason of a hole in the entrance of which it knew or should have known and which was unknown to her. It is not the type of tort which may be sustained solely upon a finding of negligence on the part of its manager or some other agent. *Others may or may not* have been negligent with respect to the condition complained of and yet liability fastens on the appellant for its wrong which does not depend on *respondeat superior.* Consequently, there is no inconsistency in the jury's verdict and the motion in arrest of judgment was properly overruled." (Italics supplied.)

In *Miller v. Alaska Steamship Co.,* 139 Wash. 207, 246 P. 296, a case in which the Court stated that the employer steamship company was under the nondelegable duty to furnish safe instrumentalities with which it required the plaintiff to work, the Court held that the verdict exonerating a fellow-servant does not exonerate the master where the liability rests upon such breach of a nondelegable duty and does not depend upon the doctrine of *respondeat superior.* In *Stoutimore v. Atchison, Topeka and Santa Fe Railway Co.,* 338 Mo. 463, 92 S. W. 2d 658, the Court held that the duty of the railroad company to furnish a shipper, who had agreed to load railroad cars, safe and suitable appliances was nondelegable, and that the verdict against the company and in favor of defendant's conductor should be affirmed on condition of *remittitur.* It is important to note in that case, as here, that plaintiff's pleadings allege negligence of both defendants and their "agents, servants, and em-

ployees," and the holding of the Court was to the effect that the pleading having alleged negligence in violation of the railroad company's duty based upon the acts of employees other than defendant's employee, judgment could be rendered against the railroad company, notwithstanding the verdict exonerating the conductor. 1 Restatement of the Law, Agency, Section 214, reads: "Failure of Principal to Perform Non-Delegable Duty. A master or other principal who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance of such duty to a servant or other agent is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty." And under Comment (c) of Section 214, page 474, by way of example, the Restatement says: "Thus, the landlord, under a duty of a tenant to keep a common stairway in repair, is subject to liability for harm caused the tenant by the negligent repair or failure to repair by one whom he employs either as an independent contractor or as a servant." Thus, it has been held that a railroad company charged with the absolute duty of maintaining its highway crossing in a reasonably safe condition for public travel cannot excuse the nonperformance of the duty by delegating the construction or maintenance to an independent contractor. 44 Am. Jur., Railroads, §496, Notes 20 and 1. Likewise it has been held that the owner or occupant of property is under the nondelegable duty to keep the premises in reasonably safe condition. 38 Am. Jur., Negligence, §95, Note 15. Perhaps it may be suggested that these last-named authorities have nothing to do with the consistency of verdicts, but they deal with the substantive law of torts and not the substantive law of agency, and, as heretofore suggested, in the *Devine* case and 1 Restatement of the Law, Agency, p. 464: "Liability exists only if all the requirements of an action of tort for negligence exist." The duty of the railroad company here being nondelegable, absolute and non assignable, is a duty which rests upon the railway company by virtue of statute, and is

distinct so far as the second count of the declaration is concerned from the duties charged to the employees, Thompson and Terry. That the declaration charges the named defendants with joint negligence is of no moment, in our opinion, under the holding in the *Wills* and *Devine* cases. If the duty is nondelegable, as we think it is, it is nondelegable for all purposes, and it matters not whether the railway company has delegated it either to an independent contractor or to employees.

As we understand the position of counsel for defendant railway corporation, they do not controvert plaintiff's position that the railway company's duty as to the maintenance and repair of the crossing was an absolute, nondelegable and nonassignable duty. But it is contended that because the defendants, Thompson and Terry, were alleged to be the servants and employees of the defendant railway company, and all three were jointly charged with negligence, there is only one act of negligence involved, namely, the negligent omission of the two employees on the basis of which negligence is asserted against the railway company. This position overlooks two important elements which enter into this case: First, the second count, in addition to alleging dereliction of duty on the part of the railway company, Thompson and Terry, also charges "the other agents, servants, and employees of the defendant corporation" with negligence in the repair and maintenance of the crossing; and, second, besides charging two acts of negligence, one against the railway company for its breach of statutory duty, and the other against Thompson and Terry, the declaration charges and the evidence discloses that "other agents, servants and employees" as to the instant crossing were under the same duty charged to Thompson and Terry to inspect the crossings and see that they were in good order and repair. We glean from this record that neither Thompson nor Terry, nor both, could personally and adequately supervise the condition, maintenance and repair of the crossing, because of the extended territory under their supervision,

as disclosed by this record. Terry, as road master, had charge of all the trackage between Elmore and Deepwater, West Virginia, as well as the trackage on the Winding Gulf branches, the V. & W. branch to Glen Rogers, the White Oak branch, and had a number of crews working under him. He viewed the crossing, according to his own testimony, by riding over it "once or twice a month sometimes." Ray Thompson, the section foreman, had charge of the trackage from Willis Branch to Dothan, and had about thirty crossings under his supervision, including the crossing at Willis Branch and Long Branch, and was wont to proceed by riding over the crossing in question about every day for a month or two but sometimes for several days at a time he made no inspection. Alfred McNeeley, one of defendant's section men, employed under Thompson, examined and noticed the crossing every time on the many occasions he went over it. He testified, "Well, we always look to see whether there was anything wrong with the crossing or not—that's our job to do—but I didn't see nothing wrong with the boards." In July, 1945, he noticed that "Some of the boards was and some of them wasn't" in sound condition. What did this witness mean by the expression "that's our job to do."? Evidently, he meant that it was the job of the section men. And Sherman Williams, a section man, testified that he passed over the crossing practically every day, and as it evidently was his duty to do, in the light of McNeeley's testimony, observed the condition of the crossing. To the effect that Terry, the road master's observation was only casual, and that the railway company relied on others to perform the duty of supervision, is his testimony that, if he were installing the boards at the crossing in question, he would not have put the boards in the way he found them on the inspection made by him just before the trial.

The correct rule, as heretofore stated, for the application of the doctrine *respondeat superior* is, as stated in 35 Am. Jur., Master and Servant, Section 534: "If the

liability of the master is not predicated solely upon the negligence of the employee in whose favor a verdict has been found, but upon the negligence of *another employee, or that of the employer himself,* a verdict against the employer is not inconsistent." (Italics supplied). Thus, it has been held that in an action against a railway company and the engineer for injuries sustained when the locomotive struck a pedestrian, a verdict holding the railway liable and exonerating the engineer, was not inconsistent, where liability is not based *solely on the engineer's negligence,* but was founded also on the negligence of the fireman. *Stokes v. Wabash Railroad Co.,* 355 Mo. 602, 197 S. W. 2d. 304; *Chesapeake & Ohio Railway Company v. Booth,* 149 Ky. 245, 148 S. W. 61. In *Berry v. Daniels,* 195 Minn. 366, 263 N. W. 115, it was held that a verdict in favor of a drug clerk who sold mineral oil containing a deleterious substance did not bar recovery against the drug store owner where the record did not disclose that the drug clerk was solely responsible for the contamination of the mineral oil. So under the broad allegations of this second count of the declaration, inveighing as they do against "other agents, servants and employees" of the defendant corporation, that, in addition to the rule in the *Wills, Devine* and kindred cases, this record clearly shows that the alleged lack of repair of the crossing was not solely the result of the negligence of Thompson and Terry, and, therefore, under the rule in the *Berry* and like cases, the verdict is not inconsistent.

Under the state of this record, if this Court should say the fact that Thompson and Terry were found not guilty, that would be just another way of saying the crossing was in good repair, and is, in our opinion, a *non sequitur.* The verdict of the jury against the railway company is a direct finding that the crossing was out of repair, and acquittal of the two individual defendants named in the second count, does not vitiate the verdict or render it inconsistent, because (1) of the absolute and nondelegable duty under Section 8, Chapter

40, Acts of the Legislature, First Extraordinary Session, 1933, Michie's Code, 17-4-8, of the railway company to maintain the crossing in proper repair, so as to give a safe and easy approach across the railway tracks, and the violation of that duty, which resulted in plaintiff's injuries; and (2) because the second count of the declaration charges and the evidence discloses that plaintiff's injuries did not necessarily result solely from the negligence of the section foreman Thompson or the road master Terry, so that the doctrine of *respondeat superior,* in the sense used by counsel for the railway company, does not apply.

But it is contended, as a second ground for reversal, that the verdict being general, was based on both counts of the declaration, namely, the negligent operation of the train and the unsafe condition of the crossing; that the verdict did not disclose upon which theory it was based, and, therefore, that it is inconsistent with the declaration. With this position we do not agree. Defendant railway company did not demur to the declaration, did not ask for interrogatories inquiring of the jury whether its verdict was based upon one or both of the counts of the declaration, and, if only one, which one; nor was the court asked to instruct the jury with respect to the doctrine of *respondeat superior* as applied to the matters charged in the first count of the declaration. Moreover, the alleged inconsistency of the verdict with the declaration was not assigned as a ground of error on the motion to set aside the verdict, nor was it assigned as error in the petition for writ of error in this Court. This case is somewhat analogous to one in which one of several counts in a declaration is bad, and the entire damages sought to be recovered are embraced in the general verdict of the jury. In such case, under Code, 56-6-26, the statute provides that judgment shall be entered against the defendant for damages found, unless the record is such that a verdict could not have been found on the good count. *Gilkerson v. Baltimore & Ohio R. Co.,* 129 W. Va.

649, 41 S. E. 2d 188; *Ray v. Chesapeake & Ohio Railway Co.*, 57 W.Va. 333, 50 S. E. 413.

The first count under the doctrine of *respondeat superior* was not proved. The engineer and fireman testified that, after rounding the curve, they had a plain view of the crossing. Nevertheless, they did not see plaintiff at any time, but continued past the crossing through the town of Pax to the terminal at Elmore between thirty and forty miles away, where they learned for the first time of the unfortunate incident. On these facts, the jury failed to render a verdict against either the engineer or fireman, or both. The declaration charges that defendant's engineer and fireman failed to keep a proper lookout, a charge which the jury evidently found was not sustained by the evidence. But, as heretofore suggested, the verdict is maintainable under the second count of the declaration, if the evidence is sufficient in other respects, because the duty charged in that count of the railroad to maintain a proper and safe crossing is absolute, peremptory and nondelegable. The record here, however, presents simply a case in which the declaration contains two counts, both of which are good and, on the trial, evidence was introduced to support both counts, and the jury rendered a general verdict awarding entire damages. This case, therefore, does not come within the holding in the case of *Crowell v. Duncan*, 145 Va. 489, 134 S.E. 576, 5 A.L.R. 1425, in which the Virginia Court held that, where, in an action for personal injuries based upon alleged negligence, which was prosecuted upon two theories of liability as disclosed by the two counts in the declaration, the court instructed the jury that if they should believe either of plaintiff's theories, they should find for the plaintiff, though the evidence failed to support the verdict on both theories, a general verdict awarding entire damages which did not indicate upon which theory of plaintiff's case it was predicated, should be set aside.

Likewise we do not agree with the position of defendant's counsel that the verdict, as set forth in the third ground of reversal, is based upon evidence wholly inconsistent with the undisputed physical facts, and therefore the verdict is contrary to the weight of the evidence. Plaintiff's testimony as to how he received his injuries, except so far as it conflicts with certain inferences which may be drawn from the appearance of the place of the injuries after their occurrence, is uncontradicted. Plaintiff testified, as heretofore stated, that after leaving the home of Jack Penn, he crossed the hard-surfaced road which ran substantially parallel with the railroad and led to the crossing in the direction of Pax. Then, instead of proceeding along that road, he climbed up the bank of the railroad right of way to a path which ran along the northerly side of the railroad, walked along that path toward the crossing until he encountered the hard surface of the road at the crossing, where he stepped "up" on the hard surface, and then crossing the north rail, stumbled between the tracks and got his left foot caught between the inside board and the southerly rail near the western end of the board. He testified that he tried to extricate his foot for several minutes, but before doing so he had to wait a short time because of the pain in his ankle. In view of the sudden and unexpected danger in which plaintiff testified he found himself after his foot was caught, the law makes allowance for any error in judgment which he may have made, and, while plaintiff's failure to untie his shoe and remove his foot therefrom may have constituted contributory negligence, it was a jury question, evidently solved by the jury in plaintiff's favor. *Roberts v. Baltimore & Ohio Railroad Co.*, 72 W.Va. 370, pt. 2 syl., 78 S.E. 357; *Harrison Engineering & Construction Co. v. Director General of Railroads*, 86 W.Va. 271 pt. 2, syl., 103 S.E. 355.

But we do not believe that plaintiff's testimony that he was crossing the tracks when he caught his foot is unbelievable and not a subject for jury determination,

and within the holding of this Court in *Acree v. Eureka Pipe Line Co.*, 122 W.Va. 242, 8 S.E. 2d 189. Nor can we say, as a matter of law, that the physical facts disclosed by the record as they existed shortly after plaintiff was injured, contradict the plaintiff's testimony as to the manner in which he received his injuries, and that the evidence adduced in support of the verdict was so incredible that it does not permit the jury to determine the factual issue. We think the jury had the right to find from the evidence that there was sufficient space between the inside board and the rail for plaintiff to catch his foot, though he was not going, according to his testimony, in a lateral direction. The inside board, according to defendant's witnesses, and as stated in defendant railway company's brief, was two and one-half inches from the ball of the rail. From the web of the rail to the outside of the ball, the measurement was one and one-eighth inches. If the measurement from the top of the board to the top of the rail was two and one-half inches, as defendant's testimony would indicate, the width from the inside edge of the board to the web of the rail was three and five-eighths inches, and if plaintiff's evidence to the effect that the minimum measurement from the edge of the rail to the inside of the board was two and six-sixteenths inches, the measurement to the web of the rail would be three and a half inches. Assuming defendant's evidence is correct, that the inside edge of the board was two and a half inches from the inside of the ball of the rail, and the board had been on a level from the top of the rail, as would be standard construction, the measurement from the top of the board to the foot of the rail would be about five and one-fourth inches, which the jury could say would afford sufficient space to catch plaintiff's foot. However, the record contains substantial evidence to the effect that the top of the board at the place where plaintiff caught his foot was one and six-sixteenths inches lower than the top of the rail, and was approximately level with the bottom of the ball of the rail, and the board was beveled so that the part next to the rail sloped toward the rail, which, according

to Thompson and Terry, was not necessarily standard construction. In these circumstances, we think it was for the jury to determine whether plaintiff's foot, if he had turned his ankle, could go diagonally into the space between the rail and the board.

Defendant railway company attempts to controvert plaintiff's theory of the case by inviting attention to certain alleged physical facts. It is asserted that if plaintiff was standing up, as he testified he was when he saw the headlight of the locomotive, he would have been killed, and that his right foot would not have been severed, if he had been in that position. From the fact that plaintiff's left shoulder was fractured, and he received certain head injuries, the jury would be entitled to believe that plaintiff leaned to one side as the train approached, and was struck a glancing blow by the train, and, as he was knocked to one side, his right foot was swung back under the wheels. Defendant asserts that plaintiff's theory is controverted by the fact that his right foot, pocketbook and blood were found west of the point where plaintiff says he was struck and in the opposite direction from which the train was coming. But the heel of plaintiff's left shoe and blood were found east of his left shoe and foot. Moreover, it was perfectly natural for plaintiff to have writhed in his agony, in which case blood would be splattered in several directions, and this record discloses that plaintiff did not, in fact, remain still after he was injured, but, in spite of the excruciating pain which he suffered, crawled from the tracks a distance of two hundred and ten feet up a "red dog" road, where he called the witness Blake from his nearby home. In these circumstances, we are of opinion that plaintiff's testimony as to the manner in which he received his injuries, though it may not be true, as a matter of fact, is credible and was properly submitted to the jury for the determination of the factual question involved.

The fourth ground for reversal, as stated in defendant railway company's brief, is the court's ruling in giving plaintiff's instructions Nos. 1, 3 and 4. These instructions were objected to by defendants on the ground that they·are abstract, are without reference or application to the evidence, and were prejudicially misleading.

Plaintiff's instruction No. 1 told the jury that: " * * * it is the duty of the defendant corporation in the operation of its railroad, to keep the public highway crossings over its tracks in repair and in reasonably safe condition for the normal use of the public highway at said crossings." This instruction, though abstract, virtually follows the wording of Section 8, Chapter 40, Acts of the Legislature (1st Ex. Sess.), 1933, and the giving of it constitutes no prejudicial error. Plaintiff's instruction No. 3, properly instructs the jury as to the duty to keep a proper lookout by those in charge of the operation of a locomotive when approaching a public highway crossing. Plaintiff's instruction No. 4, as amended, instructs the jury as to the duty of the engineer in charge of a locomotive engine, approaching a public highway crossing, and the duty of the fireman on the engine when the engineer's view is obstructed by virtue of a curve in the tracks. Both of these latter instructions are objectionable because they are in the abstract, but they are not misleading or inapplicable to the case as pleaded in the declaration. Therefore, the giving of these instructions is not reversible error. *Weese v. Rosencrance,* 116 W.Va. 569, 182 S.E. 570; *State v. Thomas,* 110 W.Va. 192, 157 S.E. 162.

And, finally, the fifth ground urged for reversal that the crossing was reasonably safe for crossing thereover from the public highway and complied with the requirements of law has heretofore been covered, and merits no further discussion.

Perceiving no reversible error in this record, we affirm the judgment of the trial court.

*Affirmed.*

Fox, JUDGE, dissenting:

I concur in the majority opinion in this case on all points except that relating to the inconsistency of the verdict returned by the jury. I am not convinced that the plaintiff's story of how his injury occurred is true; but the jury must have believed it to be true, and this Court must accord proper respect to its finding. To me, the story seems incredible; but we have many times held that a court is not warranted in setting aside a jury verdict, merely because, on the same facts, it would have made a different finding. The fact that the plaintiff was undoubtedly intoxicated at the time he was injured, and that there is evidence in the record tending to show that very shortly after his injury, and as a part of the *res gestae,* he attributed his misfortune to the use of whiskey, raises a serious question of the correctness of his final story. Of course, his being intoxicated did not lessen the duty of the defendants, but that fact, if it be a fact, serves to create doubt on the story plaintiff tells. The story, however, satisfies my associates, and, despite my doubts, I yield to their judgment.

I agree that under Section 8, Article 4, Chapter 40, Acts of the Legislature, First Extraordinary Session, 1933, a duty rested on the railway company to keep its road crossings in proper repair, and that such duty need not be pleaded; but I think it also true that exactly the same duty rested on the defendants, Thompson and Terry, alleged in the declaration to be section foreman and road master, respectively, and charged therein with the duty of keeping the crossing here involved in good repair. Let it be remembered that there is only the charge of common law negligence in the second count of the declaration, which involved the railway company, Thompson and Terry, and that is the charge of failure to keep the railroad crossing, at the point where plaintiff was injured, in proper repair.

There is no substantial proof of negligent operation of defendant railway company's locomotive and train, allegations with respect to which are contained in the first count of the declaration, and in which the railway company and Wade and Murphee, engineer and fireman, respectively, are involved. It is assumed here, as it is in the majority opinion, that the jury verdict against the railway company was based on the allegations of the second count of the declaration, relating solely to alleged defect in its road crossing at the point where plaintiff was injured.

This being true, but one act of negligence is charged. Following the preliminary allegations, in the second count of the declaration, it is alleged: "and it then and there became and was the duty of said defendant corporation, and Ray Thompson and Cecil Terry, the agents, servants and employees of said defendant corporation then and there in charge of the proper inspection, maintenance and repair of said public crossing, to inspect, keep, repair and maintain it and otherwise use due and reasonable care to keep the same in a safe and usable condition for people, and this plaintiff, lawfully using and upon said public crossing upon and over said railroad tracks of the defendant corporation, by vehicular travel, or by walking on foot, so that this plaintiff in the lawful use of said public crossing might not become hung therein. or thereon, and be injured thereby, or thereby rendered unable to extricate himself and avoid being struck by passing trains of the defendant corporation, but said defendant corporation and Ray Thompson and Cecil Terry, and the other agents, servants and employees of said defendant corporation, then in charge of the proper inspection, maintenance and repair of said public crossing and employed by the defendant corporation for that purpose, in disregard of their duties owed this plaintiff as hereinbefore set forth, carelessly and negligently failed and refused to inspect, maintain and repair said public crossing or to cause the same to be done, so as to keep said public crossing in a safe and usable condition

for the proper use of this plaintiff, who was then and there lawfully upon the same. That because of the carelessness and negligence aforesaid of the defendant corporation and Ray Thompson and Cecil Terry, the agents, servants and employees of said defendant corporation, said public crossing became and was then and there in a highly defective, dangerous and unsafe condition and had been, and had remained so, for a long period of time."

The declaration then proceeds to explain how plaintiff's injuries occurred and charges that the injury resulted: "because of the carelessness and negligence of the defendant corporation, and Ray Thompson and Cecil Terry, and the other agents, servants and employees of the defendant corporation as aforesaid." Thus it will be seen that the single act of negligence charged against all of the defendants, named in the second count of the declaration, was the failure to inspect, keep in repair and maintain a particular road crossing.

The railway company, Thompson and Terry were jointly charged with the negligence alleged in the second count of the declaration. The road crossing was, as a physical fact, either in a proper state of repair, or it was not. The duty to keep it in proper repair, whether under the statutory requirement, or under the common law against negligence, was present; and, on the theory of plaintiff's declaration, equally binding on the railway company and Thompson and Terry. If the crossing was not in proper repair, then Thompson and Terry were guilty of common law negligence; if the crossing was not in proper repair, then the railway company was guilty of negligence, under its common law obligation, and guilty of a violation of a statute on which a recovery might be had if such violation was the proximate cause of an injury resulting therefrom. On the assumption of a failure to keep the crossing in proper repair, each of the defendants was guilty of one and the same act of negligence; whereas if the crossing was in a proper

state of repair, there was no common law negligence on the part of all or either of the said defendants, and the statutory provision had not been violated. The matter is reduced to the simple proposition that there could not have been a justifiable verdict of guilty against any one or all of the defendants unless the crossing was in a bad state of repair.

If all this be true, how can a jury verdict be upheld which releases two of the defendants, equally guilty with the third, if any are guilty, and convict the third defendant of the single act of negligence charged against all of them in the declaration? It is but common sense to say that, in such circumstances, if one is guilty all are guilty; and in a court of justice the verdict of a jury which punishes one and releases the other two, should be set aside in its entirety.

The majority opinion admits that where the rule of *respondeat superior* applies this would be true; but argues that the case at bar is controlled by the case of *Wills v. Gas Coal Company*, 104 W.Va. 12, 138 S.E. 749. Admittedly, point 1 of the syllabus in that case would appear to support that contention; but a statement of law made in the decision of a case cannot be fully relied on until the facts on which such statement is made are understood. When we examined the *Wills* case we find that a boy, an infant, was injured in a mine. His employment was unlawful under the statute, and the mine owner was liable for resulting damages. The superintendent of the mine was alleged to be guilty of negligence proximately contributing to the boy's injury by reason of permitting the boy to work in the mine, and liability was sought to be imposed on the owner on the theory of *respondeat superior*, under which the owner of the mine was alleged to be liable for the act of the servant. Both the owner of the mine and his superintendent were sued, and the jury verdict was against the owner of the mine and silent as to the superintendent.

In that case this Court sustained a jury verdict, and the judgment entered thereon, on the theory that the employment of the boy in the mine was in violation of a plain statutory prohibition against such employment, in the circumstances of that case. It held the mine owner liable for his violation of that statute. It made no finding whatever as to the superintendent. There was not in that case an act of positive negligence to be considered, but a violation of a statute directed at the owner of the mine. The case differs from a case where a positive act of negligence is pleaded against an employer and two of his servants, as to a specific act of negligence. For these reasons I do not believe that the *Wills* case is decisive of the case at bar.

A jury finding that, as to a specific act of alleged negligence, in this case failure to keep a road crossing in repair, and absolutely necessary to be established to justify a finding of liability, two of the defendants were not guilty, which is only another way of saying that the crossing involved was in good repair; and where in the same verdict the finding is that another of the defendants sued for the same act of negligence was guilty on the only possible theory, namely, that the crossing was not in proper state of repair, should not be allowed to stand.

For reasons stated above, I would reverse the judgment herein, set aside the verdict of the jury in its entirety and grant a new trial. The verdict returned by the jury should not have been received by the trial court, and the motion of the railway company to set it aside should be construed by this Court to warrant our setting it aside for all purposes.

KENNA, JUDGE, dissenting:

The principle upon which the railroad company's liability rests is for violating a statutory requirement that it maintain a reasonably safe vehicular and pedestrian crossing at all points where the public roads cross its

tracks. For a case where a crossing board was alleged to be worn so that the plaintiff's foot was caught and held between it and the rail at a crossing, resulting in injury to the plaintiff by one of the defendant's trains, see *Samkiwicz v. Atlantic City R. Co.*, 82 N. J. L. 478, 81 A. 833, 39 L. R. A. (N.S.) 571, Ann. Cas. 1913C, 1363. That case deals with the railroad's duty as being statutory and its breach as involving negligence.

Since a corporation can act only vicariously or through its agents, its commission of a tort by either malfeasance or nonfeasance necessarily involves the responsibility of others than itself. Although the tort under the doctrine of *respondeat superior* places an equal liability upon the master and the servant, it is not necessary to sue both. Either or both can be sued. In this instance the plaintiff elected to include as codefendants with the railroad company, C. T. Wade and B. L. Murphee, engineer and fireman on the locomotive of the train which struck Humphrey, and Ray Thompson and Cecil Terry, section foreman and roadmaster who had charge of the construction and maintenance of the crossing where the plaintiff was injured. The case went to the jury as to all five of the defendants and a verdict of $40,000.00 was returned against the railroad company, and a verdict of not guilty as to the other four defendants. I believe that the majority opinion is conspicuously unsound in holding that a verdict may be sustained which says, in effect, that a master is liable for not performing a statutory duty and at the same time the servants, to quote the majority opinion, "in charge of the construction and maintenance of the crossing * * *" are not.

The case of *Wills v. Montfair Gas Coal Co.*, 104 W. Va. 12, 18, 138 S.E. 749, does not touch upon the principle here involved. In that case there was no verdict as to the servant. A verdict against the master was sustained. The liability or nonliability of the servant was never determined. In my opinion discussion of a nondelegable duty is as wide of the mark as is the use of the *Wills*

case. Nowhere in this record does the railroad company contend that the statutory duty was delegable, and at no time did it attempt to transfer its responsibility. Certainly it does not follow as a matter of law that because the statute makes the maintenance of safe crossings the absolute duty of the railroad, the servants to whom the discharge of that duty is entrusted are excused from its performance. If sued for its breach along with the railroad company and exonerated by a verdict in their favor, as here, since the railroad company can only act through them, its agents, it is inescapable as long as that verdict stands that no verdict against the railroad company can be sustained. It is crystal clear that to do so would be reasoning to opposite conclusions from the same set of circumstances. That cannot be permitted. Here the plaintiff alleges no breach of duty on the part of the railroad without making the servant upon whom the performance of that duty rested a defendant. The verdict said that the servants had performed their duty but that the railroad company had breached the same duty. For that reason I would reverse the judgment of the Circuit Court of Fayette County and enter judgment here for the defendant, railroad company, below.

The plaintiff stated while on the witness stand that he was struck by the defendant's engine while standing. His right foot was caught on the inside of the right rail so that his left foot was the nearer to the middle of the track. The guard or cowcatcher of the defendant's locomotive extended beyond the rail on both sides a distance of at least thirty-four inches. In my opinion it is an apparent physical impossibility for the plaintiff to have been struck in that manner and lived. I would reverse because this Court takes judicial notice of the plainly impossible.